In the Matter of the EXTRADITION OF Francesco PAZIENZA.

No. 85 Cr.Misc. #1, p. 7.

United States District Court, S.D. New York.

Sept. 25, 1985.

David Denton, Asst. U.S. Atty., New York City, for plaintiff.

Stuart Baskin, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for defendant.

## CORRECTED MEMORANDUM AND ORDER

BRIEANT, District Judge.

The United States of America, representing the Republic of Italy, has requested the extradition of Dr. Francesco Pazienza pursuant to the 1983 Extradition Treaty be-

tween the United States and Italy (entered into force September 24, 1984) ("the Treaty"), —— U.S.T. —— and 18 U.S.C. § 3184. Italy seeks Dr. Pazienza's extradition on the basis of a warrant issued by a Milan court, charging him with conspiracy, and aiding and abetting the crime of "fraudulent bankruptcy." For the reasons that follow, this Court finds and concludes that the Government's evidence is sufficient to sustain the charges under the provisions of the Treaty, that no defense raised by Pazienza bars extradition, and that the requested person shall be certified to the United States Secretary of State for surrender to the government of Italy.

On March 4, 1985, while voluntarily attending the second of two scheduled meetings with United States Customs agents in New York City, Dr. Pazienza was detained and informed that a warrant for his arrest had been authorized by the Department of Justice. Apparently with the consent of his then counsel, Dr. Pazienza was detained briefly without the benefit of a formally issued arrest warrant in this district. (Transcript of June 14, 1985, p. 114). On March 5, 1985, the Assistant United States Attorney in charge of this case, Mr. David Denton, swore to a Complaint for Provisional Arrest, averring that an arrest warrant for Dr. Pazienza had been issued in Italy on April 18, 1983 by the Investigating Judge of the Criminal Court of Milan.

The United States also moved for the detention of Dr. Pazienza without bail, which motion was opposed by Dr. Pazienza and his attorneys. At the conclusion of a full adversarial hearing, this Court found that the Conditions for provisional arrest set forth in Article XII of the Treaty had been satisfied, and that Dr. Pazienza should not be released on bail. *See* Transcript dated March 7, 1985, Decision of the Court, pp. 104–120. The proof at that hearing showed that he had been a lammister of long standing, now holding a Seychelles passport and citizenship.

Within the appropriate period of time, the Italian government provided formal documentation to support its request (Declaration of Laura Pollard, Esq., United States Department of State, and Attachments, dated April 19, 1985), and Mr. Denton filed a formal complaint for extradition. Thereafter on June 14 and July 15, 1985, this Court conducted an evidentiary hearing pursuant to § 3184.

The Republic of Italy seeks Pazienza's return in order that he stand trial on two counts of fraudulent bankruptcy. This crime in essence is the offense of knowing and wilfull misappropriation of the assets of a company later adjudicated bankrupt. According to the April 18, 1983 Milan warrant, Count "A" charges that Pazienza, together with Mazzotta, Annibaldi, Carboni, Cassella and Pellicani collaborated to misapply or embezzle Six Billion Lire loaned by Banco Ambrosiano to an Italian company named Prato Verde. Roberto Calvi, the former president of Banco Ambrosiano, is also named in Count "A". However, Mr. Calvi could not be charged with any offense because of his intervening death. Mr. Calvi was, in fact, found hanged under the Blackfriars Bridge in London, a manner of death fraught with symbolism.

Count "B" of the April 18, 1983 warrant charges that the same defendants conspired to defraud Banco Ambrosiano of the Six Billion Lire loaned to Prato Verde, with the deliberate intention of defaulting on the loan, and of using the funds for personal purposes and for the benefit of third parties. Essentially Count "A" is framed as a crime against Prato Verde, while Count "B" charges an offense causing detriment to Banco Ambrosiano.

On February 25, 1985 the Milan court issued a superseding warrant to reflect the fact that Prato Verde had been adjudicated bankrupt in 1984. Under Italian law, it is mandatory to prosecute under the Bankruptcy Act once the allegedly defrauded company is found to be insolvent. Therefore, the former Count "A" which had charged misappropriation of assets belonging to Prato Verde (Italian Penal Code §§ 646, 110) merged into and was amended to become an offense under the Italian

Bankruptcy Act of 1942, §§ 216, 219, 223. Count "B", relating to the bankrupt Banco Ambrosiano, had always been charged under the Bankruptcy Act, and remains unchanged by the superseding warrant of February 25, 1985.

According to the explanation provided by the Milan court, although Pazienza is now charged with fraudulent bankruptcy in both counts of the new warrant, "the elements of the offense against the company Prato Verde and the proof relating to the offense remain the same as they did with respect to the former charge of misapplication [embezzlement] (Articles 110 and 646 of the Penal Code)."

The provisions of the Bankruptcy Act under which Pazienza is charged state:

"*Art. 216 (Fraudulent Bankruptcy)*

Any entrepreneur adjudged bankrupt shall be subject to a term of imprisonment of 3 to 10 years when:

1. He diverted, concealed, disguised, destroyed or wasted, in whole or in part, his own properties, or, for the purpose of causing his creditors to suffer a damage, he stated or acknowledged non-existent liabilities;

2. He stole, destroyed or falsified, in whole or in part, for the purpose of deriving an unjust profit for himself or others or for the purpose of causing his creditors to suffer a damage, the books or other book-keeping entries or kept them in such a manner as to render it impossible to reconstruct his estate or business.

\*　　\*　　\*　　\*　　\*　　\*

*Art. 219—Aggravating and extenuating circumstances.*

When the facts mentioned in Articles 216, 217 and 218 caused heavy financial damage, the punishments mentioned therein shall be increased by up to one half.

The punishments mentioned in the said articles shall be increased:

1. If the guilty person committed more than one of the facts mentioned in each of the said articles;

2. If the guilty person was not permitted by law to carry on business.

\*　　\*　　\*　　\*　　\*　　\*

*Art. 223—Facts of fraudulent bankruptcy.*

The Directors, General Managers, Auditors and Liquidators of a firm adjudged bankrupt, who committed any of the facts mentioned in Art. 216, shall be subject to the punishments provided for in said article.

The aforementioned persons shall be liable to the punishment in the first paragraph of Art. 216, when:

1. They committed any of the facts mentioned in Articles 2621, 2622, 2623, 2628 and 2630, first paragraph, of the Civil Code;

2. They caused the occurrence of the bankruptcy of the Company fraudulently or by fraudulent transactions.

The provisions of the last paragraph of Art. 216 shall in any case apply." (Appendix to Complaint for Extradition at pp. 171–73).

Since Dr. Pazienza was not an officer or director of the two bankrupts, he is charged under the general accomplice liability statute (Penal Law § 110). In addition he is charged under article 112 of the Penal Law (permitting increased punishment in case of "aggravating circumstances") and article 118 of the Penal Law ("Consideration of Aggravating or Extenuating Circumstances").

■ This Court has reviewed the authenticated documents submitted by the Republic of Italy in support of its request and finds that there is probable cause to believe that Pazienza committed the crimes with which he is charged.

The Investigating Judges of Milan have provided "summar[ies] of the facts of the case, of the relevant evidence and of the conclusions reached," as provided in Article X of the Treaty. They also have supplied deposition transcripts of witnesses, including statements by Pazienza's co-defendants, Pellicani, Mazzotta, Carboni and Cas-

sella, and statements made by Pazienza himself.

The evidence relied upon by the Milan court demonstrates that in the autumn of 1981, then bank president Roberto Calvi approved a loan by Banco Ambrosiano to Prato Verde, which was then engaged in the real estate investment business. According to the manager of the Rome subsidiary of the bank, Calvi instructed that manager to permit Prato Verde to draw against the loan proceeds before the loan had been approved officially and before any collateral had been posted. (Appendix at 88–90). The Milan court traced the loan installments, and concluded that most of the funds were never received by Prato Verde. Instead they flowed to Dr. Pazienza individually, and to others of the co-defendants named in the Milan warrant of February 25, 1985. According to statements by Pellicani, "essentially all the money which Mazzotta and Pazienza put into their pockets come from or are related to the loan of 6 billion liras granted by Banco Ambrosiano to Prato Verde, ... Pazienza used 350 or 400 million liras which were part of that sum of 1,200,000,000 we are talking about to pay part of the purchase price of a boat ... named the Giulia Settima." (*Id.* at 65–66). Mazzotta stated to the Italian prosecutor that Pellicani would draw checks on the Prato Verde account, cash them, and hand the cash to Mazzotta. (*Id.* at 67). Mazzotta then kept much of this money in his own account, "at Pazienza's disposal." (*Id.* at 69). We note in passing that these statements by Pazienza's co-defendants and other witnesses are not sworn testimony. For the most part they are recorded statements made to the Investigating Judges of the Milan court and to the Public Prosecutor after each authority delivered a warning to the declarant. Notwithstanding the evidentiary concerns expressed in *Greci v. Birknes*, 527 F.2d 956, 959–60 (1st Cir.1976), we believe that these statements or depositions are admissible, or competent evidence under Article X, ¶¶ 3, 7 of the Treaty and 18 U.S.C. § 3190. They were certified by the Italian judicial authority and by the United States Ambassador to Italy.

On September 28, 1982 Dr. Pazienza was interviewed in Italy by an investigating Judge, and was permitted to review the previous statements made by Pellicani and Mazzotta. After taking exception to a detail in the statement by Pellicani, Pazienza then stated "it is also true that I, through Ascofin [a company] whose president I was, took care of the loan from Banco Ambrosiano for the company Prato Verde." (*Id.* at 94). Pazienza admitted that the fee received by his company, Ascofin, for arranging the loan to Prato Verde was 60 Million Lire, and that "with Calvi's authorization, [Pazienza] used 350 million to pay the purchase price of the seacraft Giula Settima." (*Id.* at 96). Both of these sums appear to have come out of the Six Billion Lire loan transaction which ultimately resulted in harm both to Prato Verde and Banco Ambrosiano. The judicial authorities in Italy concluded that these withdrawals were entirely unlawful, and that Pazienza and his co-defendants "were perfectly aware" that these funds belonged to Prato Verde and could not lawfully be applied for personal uses.

On February 18, 1983, Flavio Carboni, the principal shareholder of Prato Verde, was interrogated by an Investigating Judge, Dr. Pizzi, while Carboni was in custody. Carboni stated that Pazienza had acted as "finder" for the loan from Banco Ambrosiano, but that part of the deal required that approximately Two Billion Lire from the loan proceeds be paid back temporarily to Pazienza on Calvi's behalf. When Carboni questioned the agreement, seeking reassurance that Calvi would guarantee repayment of the Two Billion Lire to the borrower, Pazienza and others visited Carboni at home and accompanied him to the home of Roberto Calvi. At that meeting Calvi assured Carboni that "he would answer for the reimbursement of the money that [Carboni] was to give to Pazienza." (*Id.* at 60–61). Carboni accepted Calvi's oral promise and thereafter the loan to Prato Verde arrived in installments. According to Carboni, who heard it from Pelli-

cani, who was Prato Verde's day-to-day administrator, Pazienza subsequently received 1 or 1.2 Billion Lire of the loan proceeds.

An alleged objective of this loan transaction was to supply Calvi with funds to aid in his own criminal defense and/or to accomplish illegal activities including "settling" with the Italian Magistrates who would hear an appeal of Calvi's 1981 criminal conviction for violations of Italian currency laws. Mazzotta told the Italian prosecutor that at Calvi's direction, Mazzotta delivered a briefcase containing 400 Million Lire to an attorney named Vitalone for the purpose of "settl[ing] my [Calvi's] pendencies with the justice." (Appendix at 69–70). This money was delivered to Mazzotta by Pellicani, the manager of Prato Verde. As is explained below, the criminal court of Rome acquitted Vitalone of charges stemming from these alleged facts.

The memorandum attached to the April 18, 1983 Milan warrant concludes that before the loan was ever proposed, Pazienza, Calvi and others devised a plan to extract money from Banco Ambrosiano to be used for exclusively personal purposes. To carry out the scheme, they found a company of good reputation, Prato Verde, and offered it a loan, in order that a vehicle be set up to transfer funds to the individuals behind the scheme. The Milan court relied on the report of the Fiscal Guard, an audit division of the Italian Government, which report found that the Prato Verde loan proceeds were paid as follows:

| | | |
|---|---|---|
| Lire 1,379,500,000 | - | to Mazzotta and Pazienza |
| 326,700,000 | - | for Prato Verde company uses |
| 987,906,091 | - | for Flavio Carboni's personal use |
| 389,346,500 | - | for expenses of other Carboni companies |
| 2,903,900,000 | - | to repay personal loans from Annibaldi to Carboni |

(*Id.* at 147–48).

These and other examples found in the lengthy documentary evidence submitted by the Republic of Italy satisfy the probable cause standard and present issues for trial in Italy. The facts show that the Six Billion Lire loan was accomplished through irregular procedures involving a personal approval from Calvi for advances to Prato Verde. (See statement of Banco Ambrosiano employee, Appendix at 88–90). The loan was unsecured initially, and later secured by what appears to have been inadequate collateral. By his own admission, Dr. Pazienza and his company, Ascofin, received some of the loan proceeds. Pazienza also admits to using some of the loan proceeds to purchase a yacht, "with Calvi's authorization." There is evidence to support the charge that Pazienza, unlawfully and criminally, collaborated with two officers of Prato Verde, Pellicani and Cassella; there is evidence that Pazienza aided and abetted an officer of Banco Ambrosiano, Roberto Calvi, in diverting bank funds. Finally, both companies were adjudged bankrupt by the courts of Italy, a necessary element of the offense under Section 223 of the Italian Bankruptcy Law. Pazienza's conduct, if committed in the United States, would constitute felonies under United States laws, including violation of 18 U.S.C. §§ 371, 656, 1014, 1341, 1343, 1344 and 2314.

Dr. Pazienza denies guilt; however, this Court is not faced with the task of determining Pazienza's guilt or innocence; our inquiry is limited to the question of whether the Republic of Italy has demonstrated a reasonable basis to believe that Pazienza had committed an extraditable offense under the Treaty. *Fernandez v. Phillips,* 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Melia v. United States,* 667 F.2d 300 (2d Cir.1981); *In re Ryan,* 360 F.Supp. 270 (S.D.N.Y.), *aff'd,* 478 F.2d 1397 (2d Cir.1973). It may well prove true at trial, for example, that the fee paid to Ascofin by Prato Verde was a legitimate consulting fee rather than an unlawful diversion of funds. However, such issues are properly for resolution at trial by the court in Italy, and not by this Court.

In opposing his extradition, Dr. Pazienza argues that (1) this Court lacks jurisdiction

over Pazienza; (2) the United States Government made a binding agreement with Pazienza that he would not be arrested and would be free to leave following his interview on March 4, 1985 with United States Customs Agents; (3) the evidence of criminality is insufficient because it is based upon perjured statements by Pellicani and Mazzotta; and (4) Pazienza is charged with a political offense. We will consider these arguments in turn.

*Personal Jurisdiction*

Pazienza contends that this Court lacks personal jurisdiction over him because extradition proceedings are civil in nature and there has been no proper service of process. In short, Pazienza argues that he was induced by fraud to enter this District, and that the fraudulent misrepresentations of government agents divest this Court of its *in personam* jurisdiction.

Dr. Pazienza apparently entered the United States under another name. His use of that name, however, was lawful. He did so voluntarily and at his own expense to be debriefed by United States Customs agents concerning crimes of others committed in the United States in aid of the well known looting of Banco Ambrosiano and other related international financial criminality. Since the surreptitious transfer of money and assets into the United States may have been involved, these matters were within the jurisdiction of our Customs Service which is charged, among other things, with the enforcement of 19 U.S.C. §§ 1595a, 1202, 1592, and numerous Treasury Department regulations. While little support is found in the case law for the point urged here by the requested person, that a foreign national present in the country for such a purpose is immune from arrest, we would be concerned to seek a remedy of some sort if the facts supported the allegations. Our criminal enforcement system is unduly dependent on the snitch; complex financial crimes can seldom be prosecuted effectively without the testimony of accomplices and cooperating individuals, many of whom give information not solely from altruism but to serve their own

hidden personal agendas. In its dealings with informants the United States Government should turn square corners, to paraphrase Judge Learned Hand. However, the argument presented by Pazienza in this case, if it could succeed as a matter of law, is not supported by sufficient credible evidence to justify a finding that his appearance in this District was accomplished through fraud.

The rules governing service of process in a civil action are not binding, but at most analogous to this extradition proceeding, the sole object of which is the arrest and forcible return of the requested person in compliance with American Treaty obligations. Pazienza is a criminal defendant officially charged by judicial authorities in the requesting State. Pursuant to 18 U.S.C. § 3184, the requested person may be arrested and held in custody once he is found within the jurisdiction of the Court to which application is made by complaint under oath. The Treaty expressly provides for provisional arrest in cases of urgency (Article XII). Thus the Treaty and the implementing statute do not contemplate the situation where a requested criminal defendant, usually a fugitive from the requesting State, would be served with a summons and complaint noticing an appearance date in the future. We do not suggest that due process standards are inapplicable to extradition proceedings. However, the cases cited by Pazienza, under which civil *in personam* jurisdiction obtained by fraudulent means has been held invalid, *e.g., Wyman v. Newhouse*, 93 F.2d 313 (2d Cir.1937), *cert. denied*, 303 U.S. 664, 58 S.Ct. 831, 82 L.Ed. 1122 (1938), are inapplicable. In *Wyman* a defendant was enticed through lies and emotional appeals to enter the State of Florida, whereupon he was served with process in a suit claiming damages of $500,000 for seduction under promise of marriage.

In any event, as noted earlier, the evidence taken before me at the § 3184 hearing establishes that Pazienza voluntarily attended the March 4, 1985 meeting with two agents of the U.S. Customs Bureau.

It may well be that Dr. Pazienza and his New York civil attorney, Mr. Morrison, formed the mistaken belief in their own minds, based upon inexact communications and an assumption that the March 1985 meeting would not differ from a similar one held in September 1984, that Dr. Pazienza would be free to leave the meeting at its conclusion.

It is clear from the agents' testimony and from Government Exhibit 7 that the agents could not have bound the United States Government to an agreement that Dr. Pazienza would be free to leave the March 4, 1985 meeting. That Dr. Pazienza may have depended upon any statements made by the two Customs agents Galligan and Donelan, if he did, does nothing to change the fact that the agents lacked authority to make such an agreement, assuming one were made. Such lack of authority would be obvious to any lawyer, and probably obvious to a non-lawyer of Dr. Pazienza's education, sophistication and international experience. Both Pazienza and his attorney Morrison are deemed to know that immunity from process, of the sort claimed here, must be granted on a higher level and usually is done in writing to avoid surprise and misunderstandings.

More significant is the fact that the Customs Agents each deny having agreed to an unconditional "safe passage" for Pazienza. Galligan testified that his statement on the morning of March 4th to Morrison was limited to the fact that Galligan did not then have an arrest warrant in his possession. (Transcript of June 14, 1985, p. 101). This statement was true. According to Galligan, Morrison never inquired further. Therefore Galligan made no further representations on this subject.

Morrison's testimony is in direct contradiction. According to Morrison, Galligan made assurances "in no uncertain terms that Mr. Pazienza would be in a position of giving testimony and leaving the office and leave the country...." (*Id.* at 48). The Court regards Mr. Morrison as a generally credible witness. However, it is understandable after the fact of the unexpected arrest of Pazienza that he sincerely believes that his client, a cooperating witness, would be protected by the government to which he had volunteered valuable information, and that the wish has become father to the thought. He made no contemporaneous written record of his conversation, as a practicing lawyer of his skill and experience would be expected to do. A recorded telephone conversation between Pazienza and agent Galligan on February 15, 1985 (Government Ex. 6) makes no mention of the alleged agreement.

In January 1985 Agent Galligan attended meetings with his superiors at the Customs Bureau, with officials of the U.S. Department of State, and with the Assistant Attorney General in charge of the Criminal Division of the Department of Justice, the government branch which must initiate an extradition request on behalf of the requesting State. These meetings were concerned specifically with the status of Dr. Pazienza, although Agent Galligan had theretofore considered Pazienza only in relation to information that Pazienza might contribute to an ongoing customs investigation into activities in this country concerning Banco Ambrosiano. During these high level meetings, Galligan was never authorized by his superiors to make any promises to or agreements with Pazienza. (Transcript of June 14th, p. 108). On the contrary, Galligan learned that an extradition request was probable, and that Pazienza would then face arrest. (*Id.* at 104). Government Exhibit 7 clearly demonstrates that before the March 4, 1985 meeting took place, Galligan and Donelan each knew that Pazienza's arrest had been authorized by the Department of Justice. An agent of the Customs Bureau could not contravene a Department of Justice order, as Galligan well knew.

Government Exhibit 7, a telex from INTERPOL dated February 15, 1985, to the attention of Mr. Weintraub, an assistant special agent in the New York Customs office, states:

> "Re Pazienza FN Francesco .. By order of Stephen S. Trott, Asst. Atty. Gen.,

Crim. Div. U.S. D.O.J., as conveyed by Tel. from Philip T. White, Dr., Office of Int'l Affairs (OIA) an all out search for the subject is underway. The seeking of a provisional arrest warrant by the U.S. Atty in any district where Pazienza is located has been authorized by OIA, but no provisional arrest warrant under U.S. extradition law can be obtained until the subject is actually located, Regards, end."

Galligan testified that he was familiar with this telex before he spoke to Morrison concerning the arrangements for the March 4, 1985 meeting with Pazienza. (*Id.* at 140). While Galligan candidly admitted a subjective intention to deceive Morrison had Morrison inquired beyond Galligan's truthful answer that he then possessed no arrest warrant for Pazienza, he did not do so.

This Court accepts Galligan's version of his conversation with Morrison and finds that no such agreement of immunity from arrest for Pazienza was formed as testified to by Morrison.

In any event, the legal significance of such an agreement, if it were made, is doubtful. An extradition proceeding is neither strictly criminal nor civil; it is a hybrid. To the extent that such a proceeding should be thought of an a criminal proceeding, "criminal jurisdiction is not impaired by the illegality of the method by which the court acquires *in personam* jurisdiction." *See United States v. Wilson,* 565 F.Supp. 1416, 1422 (S.D.N.Y.1983) (Weinfeld, J.), reiterating the longstanding *Ker-Frisbie* rule.[1] To the extent that this proceeding should be thought of as civil in nature, the conduct of the United States Government or its agents, viewed most favorably to the requested person, has not reached the level of a due process violation. The cases cited in the Requested Party's brief (docketed June 18, 1985) to support the contention that civil standards apply to the method by which jurisdiction over Pazienza was ob-

tained are not in point. At most they hold that since extradition proceedings are not criminal *prosecutions,* the extradition court may apply procedural standards of a more lenient nature than required in criminal cases. *See, e.g., Melia v. United States,* 667 F.2d 300, 302 (2d Cir.1981) ("Hearsay and other excludable evidence, therefore, may be admissible"); *United States v. Galanis,* 429 F.Supp. 1215 (D.Conn.1977) ("the constitutional safeguards that accompany a criminal trial in this country do not shield an accused from extradition pursuant to a valid treaty").

*Depositions of Pellicani and Mazzotta*

■ Dr. Pazienza contends that the evidence of criminality supplied by the statements of Pellicani and Mazzotta cannot sustain a finding of probable cause against the Requested Person. This argument is based upon the fact that on March 12, 1985 a court of Rome acquitted Vitalone of criminal charges which arose out of the same general conspiracy alleged against Pazienza. Vitalone was accused of accepting Two or Three Billion Lire as a bribe intended for the magistrates who were investigating Roberto Calvi. The bribe money allegedly came out of the Prato Verde loan. In acquitting Vitalone, the Criminal Court of Rome held that "the statements were made by Mazzotta and Pellicani are, moreover, completely self-serving and therefore unreliable." (Translation of the Decision of the court, p. 46). Thus Pazienza claims that this holding "obliterates" the probable cause showing. *See Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.1973).

In order to rule on this question, this Court requested that counsel provide a copy of the Vitalone decision to us, and also obtain from appropriate judicial authorities in Italy an explanation of Italian law as to the admissibility at a future trial in Italy of Dr. Pazienza, of the same evidence as was used against Vitalone and found entitled to no weight. In a letter dated June 25, 1985, the Milan judges who have documented the

---

1. *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

extradition request responded to this inquiry. The judges replied:

"[T]his is to answer your oral request for a response to the question posed by the Court in New York concerning the effect, under Italian law, of the judgment of acquittal of Wilfredo Vitalone, as it relates to any other proceedings. Specifically, you have asked whether this judgment would preclude the use of any evidence or testimony from that case in the case of Francesco Pazienza.

Under Italian [law], the same evidence may be utilized in any other case, notwithstanding the acquittal of Vitalone. The credibility of the evidence must be adjudged anew in the overall context of each case.

In addition, we wish to point out that the acquittal of Vitalone depended only on whether Vitalone himself received a sum of cash in order to bribe judges. In concluding that the evidence was insufficient on this point, the Court nevertheless affirmatively and without qualification found that the loan from Banco Ambrosiano to Prato Verde was in fact fraudulent, and that the proceeds of the fraud went to Mazzotta and Pazienza for their personal profit."

Thus, as is the law in this Court, Italian law holds that the acquittal of one defendant does not preclude a subsequent prosecution on the same evidence disbelieved in the first trial of a co-defendant, even one charged as an accomplice where the principal has been acquitted. *See, e.g., Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), and cases cited therein. The witnesses for the prosecution may turn out to be just as unreliable in the trial of Pazienza as they were found to be in Vitalone's trial, but that is not an issue for this Court to decide. Ordinarily, the Requested Person is thought to have "no right to contradict the demanding country's proof or to pose questions of credibility.... [S]uch a contest should be resolved at trial." *Eain v. Wilkes,* 641 F.2d 504, 511 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). A prior finding that two witnesses relied on here should be

prosecuted for their perjury at Vitalone's trial does not obliterate the probable cause showing against Pazienza.

*Political Offense Exception*

■ As is true of the majority of bilateral extradition treaties to which the United States is party, the Treaty with the Republic of Italy excepts political and military offenses from extradition. Article V of the Treaty states that "extradition shall not be granted when the offense for which extradition is requested is a political offense, or if the person whose surrender is sought proves that the request for surrender has been made in order to try or punish him or her for a political offense."

The task of defining what is a political offense is left to the judiciary. This has resulted in a lack of uniformity in United States court decisions, *compare In re Mackin,* 668 F.2d 122 (2d Cir.1981) and *In re Doherty,* 599 F.Supp. 270 (S.D.N.Y.1984) with *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), evidencing the difficulty in forming objective legal criteria applicable to a political offense claim. Although there has been some effort to solve this problem by revising 18 U.S.C. § 3184, Congress has had no more success than the courts. *See generally, Note, Extradition Reform and the Statutory Definition of Political Offenses,* 24 Va.J.Int'l L. 419 (1984).

Despite the near absence of objective legal standards on this issue, it is clear that Dr. Pazienza's political offense claim must fail. To begin with, Pazienza's arguments in support of this claim are not built upon evidence introduced at the § 3184 hearing. Indeed, he did not testify at the hearing. More importantly, Pazienza's claim is essentially that the extradition request is motivated by political concerns, not that the crime charged is a political offense.

Pazienza argues, but does not testify, that several authorities in Italy have political reasons for seeking Pazienza's return. He argues that the Milan Magistrates prefer to blame the Prato Verde loan for the

failure of Banco Ambrosiano rather than admit that the bank's loans to the Italian Socialist and Communist parties are what caused the bank's collapse. Next Pazienza turns to the Italian government, and argues that it too wants to use Pazienza as a scapegoat to protect the present Socialist President of Italy, Benito Craxi.

According to the Requested Party's brief, two investigating Magistrates in Rome (but not the Milan Magistrates who issued the arrest warrant in this case) have fostered a "political scheme" against Pazienza. Magistrate Misiani is said to be aligned with Lybian terrorist factions investigated by Dr. Pazienza when he was a Secret Service agent for the Italian government ("SISMA"). Further, Magistrate Misiani is said to be motivated by revenge because the Christian Democratic Party, to which Pazienza claims allegiance, conducted a parliamentry interrogation into Misiani's affairs in 1980. (Exhibit R to Requested Party's brief).

Likewise, Magistrate Sica is said to be on the political left, and motivated by a desire to discredit the Christian Democrats through an attack on Pazienza.

If Pazienza's version is true, the Magistrates ought to be investigating the loans made by Banco Ambrosiano to the Communist Party and the Socialist Party, loans alleged to exceed 50 Billion Lire, most of it unsecured. (Requested Party's brief at 24, and Exhibit P).

In support of his claim of invidious "political" motivation on the part of the Italian Government, Pazienza urges that his cooperation with United States Customs agents is perceived as a threat to the security of the Italian Government. Pazienza claims that as part of a plan to paint him as an enemy of the Republic, the Italian Communist Party inspired news articles in *Il Mundo* and *Humanite* attacking Pazienza as the person responsible for an assassination attempt on Pope John Paul II. Pazienza claims that SISMI ordered one of its agents to plant heroin in Pazienza's New York hotel room for the same reasons—to discredit any information offered by Pazienza

to the United States. There was no proof that this happened. Finally Pazienza claims that on November 9, 1984, an attempt was made to kidnap and kill him. His brief states that Pazienza "will offer proof that the order to assassinate him came directly from the Italian Minister of Defense, Admiral Martini." There was no proof of this either.

All such tales of intrigue, suspicion, undercover police work, and internecine political warfare appear sincerely expressed. However, even as offers of proof, Pazienza's claims boil down to the theory that the extradition request is made with a view to try to punish him for his political affiliations or his political views. The Treaty exempts only requests made in order to try to punish a person for a political *offense.* But, in our limited inquiry, this account amounts to no more than speculation. We should not infer idly, in the absence of hard evidence, that a prosecution based on the diversion of funds from a corporation for the alleged purposes, among others, to buy a private yacht and to bribe one or more judicial officers, is brought against anybody for an improper "political" purpose. Rather, we should proceed upon the rebuttable presumption of regularity on the part of the Government of Italy in the enforcement of its criminal laws, until proof appears to the contrary. In this regard, the good faith of that Government, and its ability to assure the Requested Party a fair trial is buttressed by the very acquittal of Vitalone relied on by Pazienza, and discussed above. We see no reason why he would be treated less favorably by the courts of Italy than his alleged accomplice. Furthermore, good faith on the part of the Executive Branch of our own Government is to be assumed in the absence of evidence to the contrary. Extradition is not automatic and there is no reason to believe that the State Department or the Department of Justice would participate in delivering a Christian Democrat to the Socialists or Communists in aid of a political prosecution, as contrasted with the ordinary fraud case which this appears on its face to be.

The crime of fraudulent bankruptcy is not on its face a political crime, and in this case, the alleged diversion of funds is not said to be associated with any goal which could be regarded as political. Although Pazienza argues that the "alleged crimes in Italy are really part and parcel of a 'political' struggle within the country of Italy between the Socialist and Communist faction within the Government and the Christian Democratic faction," this Court concludes, as was decided in the case of Michele Sindona, who also claimed to be the victim of political persecution in Italy, that the crime of fraudulent bankruptcy is not a political offense within the meaning of the Treaty. *Sindona v. Grant,* 619 F.2d 167 (2d Cir.1980). Fraudulent bankruptcy is not a crime that comes anywhere near satisfying the so-called *Castione* test,[2] first adopted in the United States by the court in *In re Ezeta,* 62 F. 972 (N.D.Cal.1894).

 The case at bar is governed by the longstanding rule of "non-inquiry" under which United States courts generally defer to the State Department on questions of whether the requesting State's motive is political, or whether the accused would be treated fairly upon surrender. *Escobedo v. United States,* 623 F.2d 1098, 1107 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *Sindona v. Grant,* 619 F.2d 167, 174–76 (2d Cir.1980); *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). As stated long ago by Justice Holmes, "we are bound by the existence of an extradition treaty to assume that the trial will be fair." *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911). The rule of non-inquiry recognizes that extradition is an international legal act between two sovereign States. Even after court certification to the State Department, the Executive Branch has final discretion to surrender the accused or refuse the extradition request. 18 U.S.C. § 3186. Indeed, the Executive Branch can decline the extradition request for a person claiming political offender status even though the court found the exemption inapplicable. *Escobedo v. United States, supra* at 1105.

The foregoing constitutes this Court's findings of fact and conclusions of law after a hearing. The documentary evidence together with all transcripts of testimony and argument shall be certified to the Secretary of State, that a warrant may issue for the surrender of Dr. Pazienza in accordance with the 1983 Extradition Treaty between the United States of America and the Republic of Italy. The Requested Party may have a stay pending appeal, during which time he shall remain in custody of the United States Marshal.

So Ordered.

---

**2.** *In re Castione,* [1891] 1 Q.B. 149.