**Ranjit Singh GILL and Sukhminder Singh Sandhu, Petitioners,**

v.

**Romolo J. IMUNDI, United States Marshal for the Southern District of New York, Respondent.**

No. 88 Civ. 1530 (RWS).

United States District Court,
S.D. New York.

Sept. 27, 1990.

William M. Kunstler, Ronald L. Kuby, Somerstein & Pike (Mary Boresz Pike, of counsel), New York City, for petitioners.

Gloria S. Neuwirth (Paul Hoffman, Alice Miller, Nigel Rodley, Ralph Steinhardt, of counsel), New York City, for amicus curiae Amnesty Intern. U.S.A.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Ping C. Moy, Asst. U.S. Atty., of counsel), New York City, for respondent.

OPINION

SWEET, District Judge.

Ranjit Singh Gill ("Gill") and Sukhminder Singh Sandhu ("Sandhu") petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241. By issuance of such writ, they seek to prevent their extradition to India to stand trial on murder charges (and, in the case of Sandhu, other crimes) characterized by the government of India as terrorist acts. For the reasons set forth below, the writ will issue. Release of the petitioners shall be stayed pending either the filing and resolution of any appeal from this decision to the United States Court of Appeals for the Second Circuit by Respondent Romolo J. Imundi or the filing by the Indian Government or its agents in this district of further extradition complaints against Gill and Sandhu.

*Procedural History*

On May 14, 1987, federal officers arrested Gill and Sandhu in New Jersey. Sandhu's arrest was pursuant to a warrant issued by a magistrate of the Central District of California, predicated upon an extradition complaint lodged against him there. Gill was detained by U.S. Immigration officials at the same time, and held in custody until the following day, when an extradition complaint was filed against him and a warrant of arrest issued by the Honorable Ronald J. Hedges, United States Magistrate, District of New Jersey.

Petitioners were brought before the extradition magistrate, Magistrate Hedges, on May 15, 1987, and ordered held without bail. *In the Matter of the Extradition of Sukhminder Singh and Ranjit Singh Gill*, 123 F.R.D. 140, 142 (D.N.J.1988). Petitioners have been detained since then at the Metropolitan Correctional Center in New York City under the custody of Romo-

lo J. Imundi, United States Marshal for the Southern District of New York. *Gill v. Imundi*, 715 F.Supp. 592, 593 (S.D.N.Y. 1989). By these petitions, filed on March 7, 1988, Gill and Sandhu challenge their confinement pursuant to the certificates.

A. The Extradition Complaints

The original extradition complaint brought against Gill charged him with one count each of murder, conspiracy to commit murder, and aiding and abetting murder. As to Sandhu, the complaint originally recited one count of conspiracy to commit murder, arising out of a separate incident. Superseding complaints were sworn to by the government before the extradition magistrate on July 6, 1987, pursuant to 18 U.S.C. § 3184.

The superseding complaint against Gill charged murder, attempted murder and murder in furtherance of a common intention in connection with the shooting deaths of Lalit Maken, who was a member of the Indian Parliament, his wife Geetanjali Maken, and a constituent of Mr. Maken, Balkishan Khanna, on July 31, 1985 in Delhi, India.

The complaint against Sandhu charged five counts. Two of those counts charged Sandhu with robbery and conspiracy to commit robbery of the Punjab National Bank in Ahmedabad, India on January 6, 1986 and the Chemur branch of the New York Bank of India in Bombay, India on April 28, 1986. Sandhu was also charged with murder, attempted murder and murder in furtherance of a common intention in connection with attacks upon police officers occurring in Udaipur, India on April 16, 1986; wrongful confinement and wrongful confinement in furtherance of a common intention in connection with the abduction of a police officer at Antop Hill, Bombay on May 3, 1986; and conspiracy to commit murder in connection with the shooting of retired Indian Army General A.S. Vaidya on August 10, 1986.

The charged crimes against both Gill and Sundhu are said by the requesting government to have been the work of Sikh terror-

ists and certain of the offenses are punishable by death.

## B. The Hearing

The original hearing date of July 11, 1987 was changed several times, both by the magistrate *sua sponte* and at petitioners' request. On July 15, petitioners received the documents constituting the Indian government's evidence in support of the extradition request. On July 31, 1987, the court denied petitioners' motion for an enlargement of time to conduct discovery and adjourned the hearing date to the week of August 24, 1987.

On August 31, 1987, following petitioners' filing of a petition for a writ of mandamus to the district court seeking an order directing a further adjournment, the hearing was adjourned by Magistrate Hedges to permit petitioners' counsel to travel to India to investigate matters pertaining to the extradition requests.[1] The magistrate did order the government to produce to petitioners' counsel a copy of certain portions of a confession upon which the government intended to rely. A new hearing date was set for the week of November 2, 1987. On October 29, 1987, the court directed that further documents be produced to petitioners' counsel and again adjourned the extradition hearing, this time to the week of February 1, 1988.

On November 2, 1987, after briefing from the parties, Magistrate Hedges issued evidentiary rulings with respect to evidence that petitioners contended would show in the forthcoming extradition hearing that they could not receive a fair trial upon return to India and that they would be likely tortured and murdered by the Indian government if returned to India. *In re Extradition of Singh*, 123 F.R.D. 127, 140 (D.N.J.1987). The extradition magistrate held that under the applicable treaty and statutes he had no authority to consider petitioners' argument as to the treatment that may await an extraditee upon return to his home country and that such argu-

ment must be addressed to the executive branch through the Secretary of State, to whom the discretion to extradite has been entrusted. *Id.* at 137. Accordingly, the extradition magistrate excluded all evidence that petitioners intended to offer at hearing relating to the issue of treatment upon return to India. *Id.* at 140.

## C. The Evidence at Hearing

The extradition hearing was conducted in February 1988. The government's case consisted of affidavits of a number of individuals residing in India. (*See* affidavits of D.B. Bangia, S.V. Rao Kelsikar, N.K. Patni, S.C. Pandya, V.S. Kumbhar, S.K. Kishore, J.G. Bhave, C. Prabhaka, B.D. Sanghvi, S.K. Saxena, M.K. Kanabur, A.K. Kanth and S. Malik). The government also relied upon the confession of Sikde Singh, the Declaration of JoAnn Dolan; the testimony of Special Agent Mallon of the Immigration and Naturalization Service who testified to statements made by defendants after their arrest (which also were admitted into evidence); and the testimony of Roy L. McDaniel, a Supervisory Fingerprint Specialist with the Federal Bureau of Investigation. The testimony of Maremdra Patni, Additional Superintendent of Police with the State Government of Rajastan in India, also was introduced to establish the chain of custody of fingerprints taken from a crime scene. *See In re Extradition of Singh*, 123 F.R.D. 140, 162 n. 17.

## D. The Evidence as to Sandhu

### 1. *Count 1—The Ahmedabad Bank Robbery*

The affidavit of S.V. Rao Kelsikar, the bank manager of the Punjab National Bank at Ahmedabad, avers that an armed man entered his office at the bank, held him at gunpoint and tore out the telephone and alarm box. The first man together with two other armed men then robbed the bank. According to the affidavit, Kelsikar identified a photograph of Sandhu presented to him by police as that of the first man

---

**1.** Opinions on the discovery issues were filed on September 1 and 11, 1987, respectively. *See In re Extradition of Singh*, 123 F.R.D. 108 (D.N.J. 1987) (denying petitioners' motion to conduct discovery).

who entered his office. Kelsikar and other bank employees identified another individual, Sukhdev Singh, as one of the robbers. Sukhdev Singh in a written confession discussed further below, is said to have admitted that he and members of his gang robbed the bank at Ahmedabad. He does not specify by name which gang members participated, but states that Sandhu was a member of the gang. Sukhdev Singh also is said to have admitted that he helped obtain passports from a travel agent, Gyani Baldev Singh, to flee India. Sandhu admitted that he obtained a fraudulent passport to enter the United States from a travel agent named Baldev Singh. An affidavit of a handwriting expert with the Indian police identified the handwriting in the hotel register of the Motel Paradise in Ademedabad on December 22 and 24, 1985 and January 5, 1986 as Sandhu's. Based upon this evidence, the extradition magistrate concluded that there was probable cause to believe that Sandhu committed the offenses charged in Count 1. (Tr. 237–45).

### 2. *Count 2—the Udaipur Murders*

The affidavit of Deputy Police Superintendent Suresh C. Pandya states that in the early morning of April 6, 1986 a light blue Fiat automobile with three male passengers was seen driving back and forth near the police station in Udaipur. Pandya and another police officer stopped the car. In response to a request from Pandya, the driver of the car turned over a driver's license registration and other documents. The license was in the name of "Fram D. Sunwala" and bore a picture of a passenger in the car. The car registration was in the name of Mrs. Vasudeva. Pandya conducted a pat-down during which he found twelve 38–caliber cartridges, and then attempted to detain the driver. The driver called to his companions, one of whom is said to have shot Pandya in the right shoulder.

The three men in the car then attempted to flee. Deputy Superintendent of Police Mathur tried to stop the driver and was shot and killed by the passenger whose picture was on the driver's license, according to Pandya's affidavit. In the course of

their escape, the three men also shot Magistrate Vajpayee, head Constable Bhawani Singh and Sub–Inspector Rajendra Singh, the last of whom later died from the gunshot wounds.

Pandya identified a picture of Sandhu as that of the man who killed Deputy Superintendent Mathur. According to the affidavit of Police Superintendent Patni, certain of the fingerprints lifted from the car matched those of Sandhu. Hotel bills recovered from the automobile led the police to a motel in Ahmedabad, where the police there found entries in the hotel register in the name of Fran W. Sunwala. According to Patni, an Indian handwriting expert discerned that entries in the hotel register were in the handwriting of Sandhu, as was handwriting on a piece of paper recovered from the automobile. Based upon this evidence, the magistrate concluded that there was probable cause to believe that Sandhu committed the offenses charged in Count 2. (Tr. 245–56).

### 3. *Count 3—The Chembur Bank Robbery*

According to the affidavit of one K.K. Marwah, a branch bank manager, on April 28, 1986, a man walked into the office of the manager of the Chembur branch of the New Bank of India in Bombay, disconnected the phone and ordered the bank manager to bring the keys with him to the main bank hall where other bank employees were guarded by two armed men. The three armed men then stole sums of money from the bank. By affidavit, the bank manager, Kumbhar, identified a photograph of Sandhu presented to him by a police inspector as that of the first armed man who entered his office.

According to the affidavit of Police Officer Bhave, officers recovered money stolen from the Chembur bank on May 3, 1986 in an apartment building at Antop Hill, Bombay. At the apartment, Bhave states he was physically forced into the apartment and tied up by persons in the apartment. According to the affidavit of Officer Dumbhatr, when additional police officers re-

ported to the apartment, they released the tied-up officer. In addition to money from the bank, recovered was a book with the letters and numbers "DIB 1437" written on the back page. The abducted police officer identified a photograph of Sandhu as that of one of the three men who tied him up and threatened to kill him. The handwriting in the book was found to be that of Sandhu according to the Indian expert. Based upon this evidence, the extradition magistrate concluded that there was probable cause to believe that Sandhu committed the offenses charged in Count 3. (Tr. 256–60).

### 4. *Count 4—the Antop Hill Abduction*

As noted, a police officer's affidavit recited facts about his abduction in an apartment at Antop Hill, Bombay. The extradition magistrate concluded as a matter of law that the charges of wrongful confinement and wrongful confinement in furtherance of a common intention were not extraditable because they failed to meet the requirement of dual criminality and because they did not meet the "serious offense" requirement. (Tr. 261–64; Order filed Jan. 27, 1988).

### 5. *Count 5—The Conspiracy to Murder General Vaidya*

According to the affidavit of C. Prabhakar, a Superintendent of Police, on August 10, 1986, General Vaidya, a retired general of the Indian Army, was killed by two motorcyclists who pulled up to his car and opened fire. According to the government, Sukhdev Singh, one of the alleged assailants, in a written confession implicated Sandhu in the conspiracy to murder General Vaidya. Singh's confession stated that Sandhu and another member of the gang had gone to Pune, India in January 1986, discovered the address and license number of General Vaidya, and at that time, "chalked out a programme to kill Genl. Vaidya." Singh's confession identifies certain hotels and apartments where Sandhu allegedly stayed in Pune.

Handwriting analysis referred to in the affidavit of Prabhakar found that Sandhu was the person who signed the hotel registers and rented the apartment in Pune and that the license number of General Vaidya's car, "DIB 1437," which was written in the book found at Antop Hill, was in the handwriting of Sandhu. Based upon this evidence, the extradition magistrate concluded that there was probable cause to believe that Singh committed the offense charged in Count 5. (Tr. 265–71).

### E. The Evidence against Gill

The government introduced the affidavit of Suresh Malik who stated that he witnessed portions of the shooting incident on July 31, 1985, of Lalit Maken, a member of the Indian Parliament, and his wife, at Maken's house by two gunmen. According to Malik, the gunmen also shot and killed Balkishan Khanna, a constituent of Mr. Maken who was present at Mr. Maken's house, and shot but did not kill affiant Malik. Malik identified Gill as one of the gunmen in his affidavit, based on photographs presented to him by the police.

The government also introduced the affidavit of Deputy Police commissioner Kanth who indicated that two unidentified and unnamed witnesses stated to an unnamed police officer in India that Gill fled to the United States in 1986 under the alias "Yashpal Kashyap," and that Gill told them he was fleeing to the United States because, in the words of Kanth, the "police had discovered that he was one of the gunmen who had shot Lalit Maken and the others." Singh's confession stated his gang had killed Lalit Maken. The Kanth affidavit also stated that there were other, unidentified witnesses and other unidentified evidence with respect to the killings.

The magistrate ruled that the confession corroborated the identification by Malik, (Tr. 488–89), while discounting in part certain unsubstantiated multiple hearsay statements and certain photographs submitted in support of the charges against Gill. (Tr. 457, 491–92). Based on the above, the magistrate concluded that there was probable cause to believe that Gill committed the offenses charged in the complaint. (Tr. 486–96).

**F. Post–Certification Proceedings**

The certificates of extradition against petitioners were issued on February 5, 1988 and a stay entered to permit petitioners to bring this *habeas* petition, which was filed on March 7, 1988.

### (1) SAUSA Misconduct

Shortly after the filing of the petition, it was revealed that the Special Assistant United States Attorney ("SAUSA") who had conducted the extradition proceedings on behalf of the Indian government had, during the pendency of the proceedings, sent anonymous threatening communications to the extradition magistrate and to herself. The threats, worded so as to make it appear to some that they had been sent by Sikhs, were relied upon by the SAUSA as a basis for various *ex parte* sealed communications with the magistrate during the proceedings and as justification for extensive security precautions taken during those proceedings.[2]

Upon this revelation, post-certification proceedings were commenced before the extradition magistrate, during which the *habeas* proceeding was held in abeyance. At those proceedings, it was disclosed that an FBI investigation had revealed evidence of serious wrongdoing by the SAUSA in conjunction with her conduct of the case for the Indian government. Unbeknownst to petitioners, the magistrate and the SAUSA had received threats manufactured by the SAUSA herself prior to and during the extradition hearing. The unsettling messages expressed that petitioners should not be returned to India and that harm would befall one who contributed to that result.[3] The faked threats were a principal justification for the SAUSA's *ex parte* communications with the magistrate throughout the hearing with respect to security measures.

In view of these unusual developments, the government moved to vacate the certificates of extraditability to avoid any appearance of impropriety. Portions of documents and transcripts previously sealed during the extradition proceeding were unsealed at the request of the U.S. Attorney. Their substance was revealed to petitioners for the first time.[4]

---

**2.** The petitioners were chained and shackled throughout the hearing, over their counsels' objection. When the hearing began, the first issue addressed by the magistrate was security. Over the defense's objection the magistrate sustained the measures taken. By order of the New Jersey district court, on *habeas* petition brought two hours into the first day of the hearing, the hand chains on the petitioners were loosened to give petitioners the capacity to hold documents. Otherwise, the heightened security practices were continued in effect in the courtroom and outside the courthouse, including assignment of bodyguards to the magistrate and SAUSA. *See* Exhibit B to the Affidavit of Ping C. Moy.

**3.** Approximately 12 days before the substantive hearings were to begin, the magistrate received a crude cut-and-paste message: "India Government evil/U.S. Government Phony/JUDGE isn't fair/Do NOT Send Them Back." On January 15, January 20, January 26, February 5, and March 3, 1988, the SAUSA indicated to the magistrate that she had received similarly-constructed communications delivered to her at various places through various means. These said, respectively:

> Lawyer *take* Special care
> New Delhi Struggles
> Jeopardize Future For You.
>
> Don't get Dead
> *Don't* Go to court.

our message is clear
Don't Go to Court
If you decide to stay,
Death Is The ultimate revenge
It's so easy
there's no place to hide.

NO MORE Warning
Federal court Death for you.

India's Lawyer
You can't Have
Police Officers Camera
and Driver
for EVER
We Know
How to
wait

A search of the SAUSA's home by warrant yielded in addition to the prepared letters of similar nature a typewriter matching the description of the typewriter determined by the FBI to have been used in the preparation of the threatening communications, and other implements believed to have been used by the SAUSA to manufacture the threatening communications.

The SAUSA was charged by information with a felony count of obstructing justice pursuant to 18 U.S.C. § 1503 on March 10, 1989, and after trial without jury, found not guilty by reason of insanity.

**4.** Subsequent to the hearing, the extradition magistrate, pursuant to petitioners' request, or-

**(2) The Government's Motion to Rescind the Certificates**

Pursuant to an order of March 23, 1988 of Magistrate Hedges, the U.S. Attorney formalized its request that the extradition magistrate rescind the earlier-entered certifications of extraditability. The U.S. Attorney requested the magistrate "schedule a rehearing of the evidence and make a new, independent finding with respect to the issue of extradition" to avoid "any appearance of impropriety with respect to the court's decision, and in order to erase any claim that the respondents' rights could have been impinged upon by the alleged conduct of the Special Assistant U.S. Attorney." On April 12, 1988, the government once again repeated its request to have the certificates of extraditability withdrawn.[5] Petitioners for their part filed a motion for discovery and memorandum of law in support thereof on or about May 13, 1988, through which they sought to determine the parameters of the circumstances underlying the SAUSA's misconduct.

The extradition magistrate denied petitioners' requests for discovery as to the SAUSA's wrongdoing, ruling that it had had no effect on the proceedings and that petitioners had failed to show that the SAUSA's threatening communications and misrepresentations had caused them to suffer prejudice in any way. The magistrate granted petitioners leave to direct interrogatories to the Indian government's affiants limited to "whether the affiants in fact

executed the affidavits and, if so, whether the affidavits were altered in any way after execution." Order, July 29, 1988; Opinion of July 29, 1988, at 55. In addition, the extradition magistrate ordered the government to produce *in camera* and *ex parte* two categories of documents relative to communications between the SAUSA and representatives or affiants of the Indian government.[6]

Oral argument on the government's motion to rescind the certificate of extraditability was adjourned to November 15, 1988 at the request of the government. Petitioners indicated they did not oppose the government's motion to rescind the certificates of extraditability and agreed that they should be rescinded, although differing with the government over what should follow post-recision.

On November 7, 1988, the extradition magistrate issued an order which cancelled the scheduled argument, denied the government's unopposed motion to vacate the certificates and pronounced he would entertain no further application to reopen the proceedings. The November 7 letter order directed the government to convey the certifications of extraditability to the Secretary of State. The ability of the Secretary of State to issue warrants of surrender remains abridged by the stay entered by Magistrate Hedges on February 5, 1988, and the filing of the *habeas corpus* petition on March 7, 1988.

---

dered a few additional portions of transcripts of *ex parte, in camera* proceedings disclosed to petitioners. He also ordered disclosed to petitioners an additional paragraph of an *ex parte, in camera* affidavit submitted by the SAUSA in conjunction with the SAUSA's request for "(a) strict adherence to the scheduled hearing date of February 1, 1988, ... and (b) authorization for extraordinary security measures during the hearing." A few additional disclosures followed. Letter–Order, March 22, 1988; Letter from Daniel J. Gibbons to Honorable Ronald J. Hedges, March 30, 1988; Order, April 13, 1988; Affidavit of Daniel J. Gibbons, undated, and attachments thereto.

**5.** Owing to the perception of possible conflict of interest between the Requesting Country, India, and the Executive Branch of the U.S. Government, certain additional proceedings were con-

ducted before the magistrate, outside the presence of petitioners' counsel, to consider whether such a conflict existed and whether the Indian government had waived any possible conflict presented by its representation by agents of the U.S. government whom had requested vacation of the certifications.

**6.** Pursuant to the July 29, 1988 opinion and companion order, the government submitted various affidavits and attachments to the extradition magistrate which were ordered sealed by the extradition magistrate. Petitioners took issue with the *ex parte* and *in camera* representations and submission. The extradition magistrate examined the government's various submissions, determined that none of them were material, and denied petitioners the opportunity to examine any of the materials. Letter–Order and Opinion, September 30, 1988.

### (3) The Habeas Proceedings Renewed

Petitioners thereupon filed a supplemental *habeas corpus* petition with this court on February 1, 1989, asserting additional grounds for vacation of the certificate, including the misconduct of the SAUSA. The government moved to transfer the petition to the District of New Jersey pursuant to 28 U.S.C. § 1404, which motion was denied by Opinion of June 30, 1989. *See Gill v. Imundi,* 715 F.Supp. 592 (S.D.N.Y. 1989). The government thereupon filed its opposition to the *habeas* motion, as ordered by the court.

Following receipt of the government's answer to the petition, a briefing schedule on the issues presented was set down. Several adjournments later (enlargements of time were requested by both petitioners and the government to submit their papers), the matter was set for argument on January 26, 1990.[7]

### (4) The Ruling of Judge Ruikar

A week or so before the argument, the Special Assistant on the case assigned to represent Respondent learned for the first time of a ruling of an Indian court—dating from a year and a half prior—that the confession of Sukhdev Singh, relied upon at the hearings before the extradition magistrate in support of the complaints against both Gill and Sandhu, was "not voluntary and ... was not true." [8]

That ruling was contained in a written judgment of over 400 pages issued on or about May 9, 1988 by Judge Sh. V.L. Ruikar in a case charging Singh and others of attempted murder and assault on police officers and conspiracy to commit terrorist acts. Judge Ruikar found numerous irregularities in the manner in which the Singh confession was obtained, resulting in his judgment that it was not voluntary and it could not be regarded as truthful. These irregularities and suspicious circumstances included that Singh was in police custody prior to and after his confession even though, under Indian criminal procedure governing confessions, he should have been in magisterial custody; the magistrate used a police transcriber to record the confession rather than a member of his staff as was required; the magistrate did not question Singh as to why he wished to give a confession after being in custody for almost three months nor inspect him to see whether his body revealed physical signs of duress/torture; the confession was not given in open court and during regular hours; and Singh remained in handcuffs and legchains at the time of the confession.

Appeal of Judge Ruikar's disposition of that proceeding to the Indian Supreme Court was sought by the Indian prosecutor, which the parties here indicate resulted either in affirmance of the ruling of Judge Ruikar or the denial of leave to appeal.

On the basis of this newly-acquired information, which was first presented to the court at the oral argument of January 26, 1990, the parties requested and were granted additional time to make written submissions addressing the impact of the judicial findings upon the extradition proceedings. Following the government's reply received on July 9, 1990, the matter was regarded as under submission. Additional letter submissions were received from the government on August 14 and August 22, 1990 and from petitioner's counsel on August 27, 1990, commenting on the relevance of *Ahmad v. Wigen,* 910 F.2d 1063 (2d Cir.1990) to these proceedings.

In their post-argument submissions, petitioners presented to the court certain additional findings made by Judge Ruikar in a

---

7. Amicus Amnesty International was granted permission to appear and submit a brief, which it did on March 27, 1989.

8. During the course of the extradition proceeding before Magistrate Hedges, petitioners had sought, and been denied, discovery with respect to the circumstances of Singh's purported confession. After the hearing, petitioners had again sought discovery of a subsequent statement they believed had been made in India by Singh which denied the giving of the first confession. Months later, petitioners placed before the *habeas* court a document offered as a translated version of confession by Singh in the Vaidya murder case. The document, a five-page letter from Singh addressed to the judge presiding over a terrorism case against Singh in India, denied Singh had ever given the first confession to a magistrate.

separate judgment of October 21, 1989 in a proceeding charging Singh with the murder of General Vaidya. In that judgment, Judge Ruikar states that the handwriting expert of the prosecution, Mr. M.K. Kanabar, testified that Singh was the author of certain documents, including a handwritten note in a novel indicating the license number of Vaidya's car. Counsel for petitioners observe that in the affidavit that same Indian handwriting expert presented to the extradition magistrate, he credits Sandhu's hand with the same writing. Petitioners ask that this additional fact, unknown at the time of the hearing, be taken cognizance of in determining whether to vacate the certificate of extraditability, as well as Judge Ruikar's finding in the same judgment that the Antop Hill incident involving the abduction of officers and the recovery of certain funds from an apartment never transpired and that Police Officer Bhave was unable to identify the person who allegedly abducted him.

## I. *Nature of Extradition Determinations and Scope of Review*

### A. The Judicial Role in Extradition Proceedings

■ In 1852, Justice Catron, joined by four other justices of the Supreme Court, wrote that "extradition without an unbiased hearing before an independent judiciary ... [is] highly dangerous to liberty, and ought never to be allowed in this country." *In re Kaine,* 55 U.S. (14 How.) 103, 113, 14 L.Ed. 345 (1852), *quoted in In re Matter of Mackin,* 668 F.2d 122, 134 (2d Cir.1981) (Friendly, J.). The statutory scheme enacted by Congress, now codified at Title 18 U.S.C. § 3184, comports with that proposition by expressly providing for judicial determination of whether a certifi-

cate of extradition will issue, thereby giving to judges, as members of relatively non-political departments, an important role in the avoidance of such threatened dangers to liberty.[9]

An extradition proceeding is commenced by the requesting country (with whom the United States must have a treaty)[10] bringing before a judge or magistrate a complaint charging the commission, in the foreign jurisdiction, of crimes subject to the extradition treaty. 18 U.S.C. § 3184. The subject of the complaint may then

> be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearings, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same ... to the Secretary of State, that a warrant may issue ... for the surrender of such person, according to the stipulations of the treaty or convention; ....

18 U.S.C. § 3184.

■ Courts have long understood that the hearing before the extradition magistrate does not determine the guilt or innocence of the accused but rather represents a judgment whether there is competent evidence that would support a reasonable belief that the subject of the proceedings was guilty of the crimes charged. *See Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Collins v. Loisel,* 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Ahmad v. Wigen,* 910 F.2d 1063, 1066 (2d Cir.1990); *Melia v. United States,* 667 F.2d 300, 302 (2d Cir. 1981). Absent such evidence, no certificate may issue, and no extradition may occur. A grant of a certificate, however, "puts the

---

**9.** As Judge Friendly observed in *In re Mackin,* under the statutory scheme, judges fulfilling this independent role need not be appointed or exercising powers pursuant to Article III of the U.S. Constitution. They may be federal or state judges, or magistrates at the federal or state level. Apparently, the important point in giving this task to judicial officers was that the certification stage of extradition be separated from the more political executive or legislative departments of government, although the certifi-

cation is itself "nonjudicial because, as pointed out in *Mackin,* 668 F.2d at 136 n. 9, the Secretary of State is not bound to extradite even if the certificate is granted." *United States v. Doherty,* 786 F.2d 491, 499 n. 10 (2d Cir.1986) (Friendly, J.).

**10.** The Treaty of Extradition involved in this case is set forth at 47 Stat. 2122.

extraditee well on the way to extradition," *United States v. Doherty*, 786 F.2d at 502, although leaving the ultimate decision to surrender the accused to the requesting nation to the Secretary of State. *See* 18 U.S.C. § 3186; *Ahmad v. Wigen*, 910 F.2d at 1067; *In re United States*, 713 F.2d 105, 108 (5th Cir.1983).

**B. Habeas Review of Extradition Determinations**

■ Neither the accused nor the government may appeal from a determination by the extradition magistrate against its interest. *See Ahmad v. Wigen*, 910 F.2d at 1065; *In re Doherty*, 786 F.2d at 503; *In re Mackin*, 668 F.2d at 127. The requesting government's recourse to an unfavorable disposition is to bring a new complaint before a different judge or magistrate, a process it may iterate apparently endlessly. *In re Doherty*, 786 F.2d at 501. The sole recourse of the extraditee against whom a certificate has been lodged is the bringing of a *habeas corpus* action. *Id.* at 501–02.

■ In the latter case, ever since *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (Holmes, J.), a panel of the Second Circuit recently has reminded *habeas* judges sitting in the extradition context, the law has been that "[h]abeas corpus is not a writ of error, and it is not a means of rehearing what the certification judge or magistrate already has decided." *Ahmad v. Wigen*, 910 F.2d at 1066. Evident even in *Fernandez*, however, is the duty of the reviewing court to consider the evidence that was before the extradition magistrate so that it can decide whether it was fairly concluded that "probable cause to believe the defendant guilty was shown by competent evidence...." *Fernandez*, 268 U.S. at 314, 45 S.Ct. at 543.

Moreover, the recent decision in *Ahmad* confirms that the *habeas corpus* court's scope of review is not quite so limited as

the frequently-cited *Fernandez* formulation, noted below, suggests. Whereas *Fernandez* pronounced that review concerns only "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and ... whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty," 268 U.S. at 312, 45 S.Ct. at 542 (citations omitted), the *Ahmad* panel followed several other courts when it further deemed worthy of consideration whether the "Government's conduct violated [ ]either the Constitution [ ]or established principles of international law." *Ahmad*, 910 F.2d at 1065. *See In re Burt*, 737 F.2d 1477, 1482–84 (7th Cir.1984); *Plaster v. United States*, 720 F.2d 340, 347–49 (4th Cir.1983).[11]

■ Thus, *habeas* remains available as a means by which the extraditee may test the "legality of the extradition proceedings," *Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir.1980) (quoting *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir.1965)), and under even the view of *Ahmad*, such testing subjects to examination the extradition proceeding's conformance with the requisites of the extradition laws and treaties and, if called for, the Constitution and international law. By their joint petition, Gill and Sandhu seek to test the legality of certain determinations of the extradition magistrate with the following result.

**II. *Fairness of Hearing Procedures***

Petitioners claim they were denied due process of law by limiting rulings of the magistrate relating to discovery and the presentation and examination of witnesses. They assert also that the magistrate exhibited bias against petitioners and otherwise failed to abide by standards governing extradition hearings, denying them a right to a hearing before a neutral trier of fact.

---

11. In this respect, the *Ahmad* panel seems, like the courts described by Judge Weinstein in *Ahmad v. Wigen*, 726 F.Supp. 389, 396 (E.D.N.Y. 1989) and Chief Judge Chambers in *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. de-*

*nied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978), to have "purported to stay within the scope of review established" in *Fernandez* while in practice following a "somewhat broader" approach than Justice Holmes enunciated.

## A. Discovery and Witness Testimony Rulings

 Petitioners sought and were denied permission to depose Indian government eyewitnesses referred to in affidavits through letters rogatory (in aid of petitioners' contention that highly-suggestive, impermissible photographic identification procedures, and possibly threats, were used to obtain the witness identifications); to obtain the facts and circumstances attendant to the confession of Singh (in aid of their contention that the confession was coerced); and to discover the identities of two unnamed persons referred to in the Affidavit of Kanth, who allegedly told affiant Kanth that petitioner Gill had advised them of his involvement in the Maken shootings. Petitioners were also denied the (hypothetical) opportunity to present expert testimony to the effect that the government's handwriting expert's determination as to Sandhu's authorship of certain documents was predicated upon quantities of writing insufficient for any expert to state an opinion as to authorship.[12]

With respect to discovery, the Second Circuit has previously declared meritless the "contention that the extradition proceedings were defective in some manner because the … [extradition] court did not grant [petitioners'] motion for discovery" of evidence that apparently had been lodged with and reviewed by the extradition judge in connection with making a certification of extraditability. *Messina v. United States*, 728 F.2d 77, 78–79, 80 (2d Cir.1984) (respecting discovery of tapes of conversations which were described by Court of Appeals as basis of extradition charges against extraditee). If *Messina's* sweep is too broad, as it seems to be in excluding from the accused's purview evidence actually reviewed by the extradition magistrate in connection with the certification determination, nevertheless under the principles set forth in *Messina*, Magistrate Hedges acted within his lawful discretion in denying the disclosure requests of petitioners here in question, which sought discovery of evidence other than that the government offered at the hearing.

 This court must abide the settled if somewhat murky principle of extradition law that an accused has no confirmed right at an extradition proceeding to present evidence that contradicts the requesting party's case. "[E]vidence of … facts contradicting the demanding country's proof or of a defense … may properly be excluded from the Magistrate's hearing." *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.1973), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). The law permits the magistrate to limit the extraditee to "testimony which explains rather than contradicts the demanding country's proof," *id.*, 478 F.2d at 905 (quoting *United States ex rel. Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir.1963), *cert. denied*, 376 U.S. 952, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964)); *see also Messina v. United States*, 728 F.2d 77, 80 (2d Cir.1984) (following *Petrushansky*), and nowhere requires a magistrate to authorize compelled disclosure of sources of such explanatory testimony. *See Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

Thus, although Magistrate Hedges presumably had the inherent power to approve of such discovery requests, *see United States v. Staples*, 256 F.2d 290, 292 (9th Cir.1958); *Oen Yin–Choy v. Robinson*, 858 F.2d 1400, 1407 (9th Cir.1988), he acted within his discretion in declining to do so at risk of converting the extradition hearing into a "dress rehearsal trial". *Jhirad*, 536 F.2d at 484; *Emami v. United States District Court*, 834 F.2d 1444, 1452 (9th Cir. 1987).

 For much the same reason, the Magistrate did not render the proceedings illegal or unlawful by refusing to permit petitioners to introduce testimony of their own handwriting expert, although he was free to allow them to do so. The petitioners' proffer made evident that such testimony would not serve to "explain" or

---

**12.** The opportunity is described as hypothetical in that petitioners proffer, when made, was not based upon having secured expert testimony to the noted effect.

"obliterate" the government's evidence, so much as to pose a conflict in the testimony of two handwriting experts as to the conditions permitting evaluation of a writing's authorship. *See Shapiro*, 478 F.2d at 905 (approving exclusion of testimony on grounds that it would "only pose a conflict of credibility"); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir.1980) (no right in extradition proceeding to rebut prosecutorial evidence). Thus, although such testimony could be permitted at a hearing, the determination to exclude it was within the discretion of the magistrate, who violated no right held by the petitioners in so doing.

B. Magistrate's Reluctance to Make Determinations as to Credibility/Reliability

Petitioners further claim that they were denied a fair hearing owing to the magistrate's misconception of his role as extradition magistrate. The magistrate took the view that it was not for him to go beyond the face of the affidavits in considering the credibility or reliability of affiants, a conception that has been adhered to by others sitting as extradition judges. *See Shapiro*, 478 F.2d at 905 (extradition judge's refusal to examine the credibility of testimony and statements held "clearly proper" where declarants were not before him).

 The magistrate does appear to have been mistaken to the extent he expressed on occasion the understanding that the extradition court lacked the authority and discretion to go beyond the face of the government's affidavits for purposes of determining credibility or reliability; *See, e.g.*, Tr., Feb. 2, 1987, at 228–29 (where the accused sought to introduce explanatory or obliterating evidence). Several cases support the capacity of the extradition judge to make such determinations under those circumstances. *See e.g., Escobedo v. United States*, 623 F.2d 1098, 1102 n. 10 (5th Cir. 1980) (noting magistrate's role in assessing credibility); *Republic of France v. Moghadam*, 617 F.Supp. 777, 782–84 (D.C.Cal. 1985) (examining motives, facts and circumstances attendant to hearsay statement in extradition proceeding); *Freedman v.*

*United States*, 437 F.Supp. 1252, 1265 (N.D.Ga.1977) (stating magistrate "should involve himself in a determination as to the reliability of the affidavits presented and not merely blindly believe such statements without regard to the underlying facts upon which the officer believed that the information was reliable"); *Shapiro v. Ferrandina*, 355 F.Supp. 563, 572 (S.D.N.Y. 1973) (noting that "improbability or vagueness of the testimony may destroy the probability of guilt").

 However, that does not mean that a magistrate is required to do so, and the record does not reveal that the magistrate abused his discretionary powers in this regard. It is recognized that "[t]he credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate." *Quinn v. Robinson*, 783 F.2d 776, 815–16 (9th Cir.1986); *Escobedo*, 623 F.2d at 1102 n. 10 (5th Cir.) ("credibility of the reported identification is a matter committed to the magistrate"). Thus, that a different magistrate might have conceived of the scope of its inquiry in broader terms, granted petitioners more leeway in introducing testimony or conducting discovery, or involved himself more immediately in scrutiny of the credibility or reliability of the evidence in no way establishes that Magistrate Hedges, who perhaps took a narrower approach than that certain other courts have followed by limiting himself to facial evaluation of affidavit testimony, abused his discretion in performing the fact-finding role of extradition magistrate.

C. Bias and Partiality

 Petitioners also claim, also unsuccessfully, that the magistrate abused his discretion in refusing to recuse himself on grounds of partiality and bias and in refusing to vacate his certifications upon the unopposed motion of the U.S. and Indian governments. Petitioners, quite understandably, perceive their mistreatment as a result of the extreme security measures to which they were subjected—owing, at least in part, to threats fabricated by the SAUSA. However, there is an insufficient ba-

sis for their claim that those measures—and the threats behind them—caused the magistrate to act partially or with bias.

As noted, the magistrate received a threatening letter days prior to the first day of the scheduled hearing which may have appeared to have been authored by persons allied with the political causes with which the accused are affiliated. That letter, and another letter purportedly received by the SAUSA, spurred the U.S. Marshals to take elaborate security precautions including the shackling of the petitioners throughout the February hearing.

Receipt and knowledge of such threats, and such visible, tangible precautions as leg irons and shackled bodies, particularly in the context of a hearing of individuals charged by a foreign nation with committing terrorist, murderous acts, conceivably might contribute to an atmosphere favorable to the requesting government. The letter received by Magistrate Hedges, however, was not believed at the time to have been authored by either defendant; the *ex parte* proceedings involving the SAUSA and the magistrate were restricted to the subject of such threats and did not stray onto substantive issues; and, apart from the security precautions taken, petitioners point to no particular determinations during the proceeding that prejudiced them as a result of the threats. *In re Extradition of Singh,* 123 F.R.D. 140, 149–150 (D.N.J. 1988).

Mandatory recusal in the face of threats to judicial officers, if adhered to as a general rule, would create a judge shopping problem, as several courts, including the extradition court, have observed the ease with which the device of issuing threats might be used to create questions as to the impartiality of a judicial officer. *Id.* at 149 (citing *United States v. Dalfonso,* 707 F.2d 757 (3d Cir.1983) and other cases). That observation has considerably restricted value, however, when the agent of such threats turns out to be a representative of the government and the deliberation in question (because arising post-hearing) is not truly whether to recuse but whether to vacate findings based upon the appearance

of impartiality. In that context, there is little, indeed presumably no, risk that an order of vacatur predicated upon the possible effect conduct by the government representative had upon the proceeding would set a precedent availing of forum shopping, because it is inconceivable that Assistant United States Attorneys as a class, or individually, would be prone to engage in such misconduct. Thus, the authority noted does not under this unique circumstance caution against vacatur.

Whether, nevertheless, it constituted an abuse of discretion under such circumstances to refuse the requesting party's motion to vacate the certificates is a separate proposition. In considering that motion, Magistrate Hedges undertook measures to determine whether the SAUSA's behavior included alteration of any of the evidence admitted into the record, 123 F.R.D. at 165–66, and subsequently found it did not. *See* Letter Opinion of Nov. 7, 1988. Presumably, in arriving at the conclusion that the hearing had been fair and that petitioners had sustained no prejudice, he also undertook to evaluate whether the atmosphere created at the hearing due to the SAUSA's conduct in any material way influenced his own appraisal of the evidence and the parties, and found that it did not. *See In re Extradition of Singh,* 123 F.R.D. at 150, 152 & n. 9, 154, 155 (no ground for recusal); Letter–Opinion of November 7, 1988 (new hearing would be pointless).

 Others might more sympathetically have regarded the concern for avoiding the mere appearance of impropriety arising out of the prosecutor's conduct, even after concluding that no prejudice arose therefrom. Such determinations involve considerable discretion, however, and the magistrate was entitled to regard the administrative costs associated with the gesture of rehearing as outweighing whatever the gain in appearance. *See* Letter–Opinion of Nov. 7, 1988. Of course, there is no discretion as to petitioner's right of access to an unbiased and impartial hearing officer. *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (due process

clause extends right to an unbiased judge). As no evidentiary basis for disturbing the magistrate's conclusion as to his impartiality has been presented, there is no cause for issuance of the writ on that ground.

## III. The Probable Cause Determination

 Petitioners next claim that there was no competent evidence by which the magistrate could have found probable cause to believe them guilty of the charged crimes. As noted, the *habeas* court does not sit to superimpose its view of the record on that of the extradition magistrate; hence, the writ does not issue if the magistrate relied on competent evidence sufficient to support the conclusion that a reasonable person would believe the petitioners guilty. *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542; *Jhirad*, 536 F.2d at 482.

 Ordinarily, the competency of evidence is evaluated as of the time of its reception at hearing. From that point of reference, giving due deference to the hearing officer, the magistrate's determination of extraditability was predicated upon sufficient evidence to support a finding of probable cause. This *habeas* proceeding, however, presents unusual, perhaps unique, circumstances requiring the court's cognizance of developments arising post-hearing that warrant application of a different frame of reference. *Cf. Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir.1988) and *Na–Yuet v. Hueston*, 690 F.Supp. 1008, 1011–12 (S.D.Fla.1988) (both considering whether newly-discovered

evidence justified reevaluation of certification findings).

The confession of Singh was significant evidence submitted by the requesting government in support of its extradition charges and relied upon in various respects by the extradition magistrate in his certification determinations. That confession subsequently was adjudged, by a specially-designated court of the requesting country hearing charges against Singh brought in a "Terrorist Sessions" case, to be "neither voluntary nor true." Ruling of Judge Ruikar, ¶ 320 at p. 384.[13]

The Indian court's ruling, contained in a May 9, 1988 judgment, came into being after the original issuance of the certification of extraditability by the magistrate in February of that year, but was issued in India during the pendency of post-hearing extradition proceedings here having as their subject matter the appropriateness of vacation of the certificates, issuance of which had been predicated, in part, upon the Singh confession. The judicial ruling, knowledge of which the Indian government must be assumed to have obtained at or around the time it came down, did not come to the attention of petitioners nor, apparently, of the new SAUSA representing the interests of the Indian government in the extradition proceeding.[14] As the Indian government did not take steps to notify the court of the ruling, it was never placed before the extradition magistrate prior to his closing of the proceedings in November of 1988, when the motion of the government, joined by petitioners, for vacation of the documents certifying petitioners' extraditability to India was denied.[15]

---

**13.** A copy of portions of Judge Ruikar's decision relating to the Singh confession is set forth at Exhibit One to the Declaration of Ping C. Moy. Judge Ruikar was sitting on a special priority court having exclusive jurisdiction over cases arising under the Terrorist and Disruptive Activities (prevention) Act ("TADA") of 1985.

**14.** The Indian Government, as the requesting party also must be presumed to have been aware of the post-hearing proceedings, particularly since part of these post-hearing proceedings involved the submission of interrogatories to affiants in India, transmitted through "appropriate channels to the Government of India," to enable the extradition magistrate to determine

whether certain evidence introduced at the hearing by the government had been altered or tampered with, an effort made necessary by the "overwhelming wrongdoing" of the SAUSA first assigned to the case to represent the interests of the Indian Government. *See In re Extradition of Singh*, 123 F.R.D. 140, 144, 166.

**15.** There is no suggestion in the record that the United States government deliberately concealed knowledge of Judge Ruikar's ruling from petitioners, the magistrate, or this court. The Special Assistant who is assigned to this *habeas* proceeding represents the United States Marshal, not the Government of India. As such, he apparently was not in close contact with the

The record of the extradition hearing discloses that the confession was offered in support of the single count against Gill (Tr. 442, 455–56) and received in support of all four of the standing counts brought against Sandhu (Tr. 76–77, 91, 202, 208–210). With respect to one of the counts against Sandhu—the robbery of Chembar Bank—the magistrate disclaimed reliance on the Singh confession in making his probable cause determination (Tr. 258) and thus as to that count a judicial ruling that the confession was "neither voluntary nor true" has no direct bearing.

The same cannot be said with respect to the other counts against Sandhu nor the count against Gill. The magistrate's Count Two determination against Sandhu (the Udaipur killings) may or may not have been influenced by the confession, the record disclosing that his findings were based on a particular affidavit "and the exhibits," (Tr. 245–56), one of which offered by the government on this count was the confession (Tr. 91). The record on Count One (the Punjab bank robbery) shows explicitly that the confession played a corroborative role in the magistrate's probable cause assessment of Sandhu's guilt on that charge (Tr. 241, 244), much as the record discloses that on the one count against Gill, Singh's alleged statement, although disregarded for certain purposes, was relied upon in other respects in arriving at the probable cause finding (Tr. 489–90). Finally, with respect to Count Five charge of conspiracy to murder General Vaidya against Sandhu, the magistrate expressed his determination, from "review of the confession of Sukhdev Singh, that Sukhdev Singh does implicate" Sandhu in the murder (Tr. 268, 269–270).

Respondent takes the position that Judge Ruikar's ruling is, nevertheless, irrelevant to the findings of probable cause, not because it arose after the February certification but because an accused has no right to contradict the demanding country's proof. Thus, the government argues that Magistrate Hedges would not have been obliged to take notice of Judge Ruikar's ruling had he been made aware of it, and the certificates therefore ought not be vacated or subject to re-examination.

■ A judgment of a tribunal of the requesting nation declaring involuntary and untrue co-conspirator confessionary evidence directly relied upon by the requesting nation to establish the probable guilt of subjects sought for extradition cannot be disregarded as a matter facially irrelevant to the task before the extradition magistrate. Such a result miscomprehends the limited significance that attaches to the separation between proof that is of a "contradictory" as opposed to "explanatory" nature. That distinction, acknowledgably "difficult to articulate," *In re Extradition of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y. 1978), becomes less wooden when its purpose of preventing a full-scale trial, involving witnesses telling competing stories, is contemplated. *Id.*, at 688. As recounted in *Sindona*, were it not for some such limitation on the defendant's proof, the requesting country would need:

> to produce all its evidence here, both direct and rebutting, in order to meet the defense thus gathered from every quarter. The result would be that the foreign government ... would be compelled to go into a full trial on the merits in a foreign country, under all the disadvantages of such a situation, and could not obtain extradition until after it had procured a conviction of the accused upon a full and substantial trial here.

*In re Wadge*, 15 F. 864, 866 (S.D.N.Y.1883), *quoted in In re Extradition of Sindona*, 450 F.Supp. 672, 685 (S.D.N.Y.1978).

The desire to avoid a full-scale trial embracing credibility issues that would, in any event, be reconsidered by an Indian tribu-

Indian Government over the course of proceedings and did not learn of the ruling by Judge Ruikar until he saw a reference to it in Singh's statement retracting his confession, which had been furnished to the *habeas* court and the government by petitioners in December 1989.

At that time, he inquired into, obtained and produced a copy of the decision, which had been rendered—and presumably had been in the hands of the Indian Government—some 20 months before his inquiry.

nal plainly animated Magistrate Hedges determination not to permit petitioners independent discovery of the circumstances of Singh's confession, which they sought prior to the original hearing, and his refusal to consider to any significant degree petitioners' more general proffer with respect to the practices allegedly engaged in by Indian police to induce confessions. *See In re Singh*, 123 F.R.D. at 111, 115, 118 (holding petitioners challenges to Singh confession "should be made in an Indian court"). Taking cognizance of rulings already made by an Indian court as to the truthfulness of that same confession, of course, implicates none of those concerns; indeed, it comports with the purpose of the limiting distinction between explanatory and contradictory evidence because it requires the taking of no testimony requiring the extradition magistrate to weigh and choose between contradictory stories.

None of the cases cited by the respondent suggests otherwise. *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir.1981), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), held that recanting statements of an accomplice who previously implicated the accused could be excluded from evidence in an extradition proceeding, where the magistrate and reviewing court had considered the facts and circumstances lending credibility to the original, inculpatory statements. Introduction of the subsequent retractions at the extradition hearing would have required the magistrate, and not an Israeli judge, to determine credibility, a conclusion central to the holding that "such a contest should be resolved at trial in Israel." *Id.* The case contains no hint that had such contest already been resolved at trial in Israel, the result would have been properly disregarded by the extradition magistrate as "contradictory" rather than "explanatory" evidence.[16]

The only case remotely close to the facts here is *In re Pazienza*, 619 F.Supp. 611 (S.D.N.Y.1985), which concerned an extradition judge's decision to forgo reliance on a judicial ruling in the requesting country, Italy, that held "self-serving" certain statements two co-defendants of the accused made in the Italian trial of still another person. Those statements apparently inculpated the extraditee and exculpated themselves in the financial scheme in which the extraditee was alleged to have participated. *See Id.* at 619.

*Pazienza* does not aid the respondent. Unlike the proceeding against Gill and Sandhu the extradition judge in *Pazienza* had the opportunity fully to consider the persuasiveness of the Italian judicial ruling in making his extraditability determination and in fact abided by his understanding of the Italian law in making that determination. Thus, the U.S. extradition judge solicited from Italian judicial authorities an explanation of Italian law as to the potential admissibility of testimony from these same "self-serving" witnesses at a trial of the extraditee, and received one to the effect that, notwithstanding the prior ruling, their testimony would be fully admissible at a trial of the extraditee in Italy. *Id.* at 618–19. Thus, he apparently reasoned that it remained for an Italian court there to consider the credibility of the witnesses as against the extraditee.

Here, in contrast, respondent takes the position that the Singh confession would not be admissible at trial of petitioners in India under Indian rules of evidence. That legal fact, if present in *Pazienza*, by all appearances would have led the extradition judge to evaluate the Italian ruling in a different light. Thus, *Pazienza* ill serves respondent, assuming foreign admissibility is in some way relevant to the issue.

Even if it is not, it remains the case that in *Pazienza* the foreign ruling was before the court as a factor which the extradition judge could consider in evaluating the reliability of the evidence presented. That the

---

**16.** Indeed, in *Eain*, the Seventh Circuit based its conclusion in part on the fact that a judicial officer in Israel in fact already had "determined that the witnesses understood their statements and that the statements were made of their own free will." *Eain v. Wilkes*, 641 F.2d at 511.

Here, by contrast, an Indian court held, in a judgment affirmed on appeal to the Indian Supreme Court, that the Singh confession relied upon by the government was not made of the accused's free will and was not truthful evidence.

judge in the particular circumstances of that case did not find the ruling of much consequence does not permit the assumption that the detailed findings of Judge Ruikar as to the length and condition of Singh's confinement and the truth and voluntariness of his purported confession would not be relevant to an extradition magistrate's assessment, in this proceeding, of the evidentiary value of the confession.[17] Here, owing to the requesting party's silence, the magistrate had no knowledge of Judge Ruikar's ruling, and hence was deprived of the benefit of his findings.

Thus, no cases hold, as the government would have this court, that an adjudication in the courts of the requesting country that the very recanted statement upon which the requesting country here relies in an extradition proceeding is untrue and involuntary, is irrelevant to the certification ruling. To the contrary, such an adjudication would appear to be of considerable potential relevance to an extradition judge charged with making a determination whether it is reasonable to believe, on the basis of such a statement and other evidence presented, that the accused committed the crimes for which his extradition is sought.

In view of that conclusion and the fact that the extradition magistrate was deprived of knowledge of the ruling by Judge Ruikar bearing on the Singh confession during the relevant period in which the certifications remained subject to the extradition magistrate's consideration, it is appropriate to grant the writ, thereby vacating the certificates and permitting a new hearing.

In arriving at that conclusion, it is again necessary to note that the record reflects consideration of the confession with respect to all but one particular count. It may be that a number of these "tainted" counts could be supported by independent evidence sufficient to create probable cause absent consideration of the confession. The record does not, however, safely yield an understanding that the extradition magistrate would have so found, and it would usurp the function reserved to extradition magistrates, *see Ahmad,* 910 F.2d at 1064, were the *habeas* court to minutely re-sift the evidence and second-guess whether, discounting the confession, an extradition judge would find evidence on a particular count sufficient to cause a person of ordinary prudence to entertain a reasonable belief in the guilt of either accused. *See also Fernandez,* (*habeas* "not a means for rehearing what the magistrate already has decided"); *Eain,* 641 F.2d at 508 (due deference must be accorded to magistrate determinations); *Mirchandani v. United States,* 836 F.2d 1223, 1225 (9th Cir.1988) (proper for extradition magistrate to reconsider charges tainted by reliance on subsequently-discovered inaccuracies in affidavit); *Na–Yuet v. Hueston,* 690 F.Supp. at 1011–12 (newly discovered evidence casting substantial doubt on sufficiency of evidence presented at extradition hearing warrants additional hearing); *cf. Peroff v. Hylton,* 563 F.2d 1099, 1099 (4th Cir.1977) (no new hearing on extraditability necessary where even viewed in light of newly discov-

---

17. A number of cases argue, to the contrary, that such information would be highly relevant. *See Republic of France v. Moghadam,* 617 F.Supp. at 782–784 (considering circumstances of confession in evaluating reliability of statement and its recantation); *see also Eain,* 641 F.2d at 511 (considering as relevant to probable cause determination conditions under which confessional statement was given); *cf. Matter of Manzi,* 888 F.2d 204, 206 (1st Cir.1989) (magistrate's refusal to review translated judicial decision rendered in requesting country which purportedly reversed accused's conviction of certain offenses in Italy did not violate due process where no evidence was produced that suggested ruling was relevant to extraditee's case, and appellate decision neither named extraditee nor

concerned the extradition charges pending against extraditee). *In re Atta,* 706 F.Supp. 1032, 1052 (E.D.N.Y.1989) also stands for the view that the extradition judge should evaluate "the circumstances as a whole" in judging whether confessions "are worthy of belief." In *Atta,* the judge apparently did not consider relevant to those circumstances whether a confession had been "induced by long periods of confinement or torture," *id.,* when dealing with a confession that had not been recanted, in a case which did not involve judicial findings in the requesting country as to the confinement of the confessor. Sandhu's confession, as noted, was recanted and an Indian court has examined in detail and found suspect the circumstances under which it was given.

ered evidence, original showing "amply" supported finding of probable cause).[18]

Such re-sifting by a *habeas* court is particularly inappropriate here in view of the petitioners' strenuous argument at the extradition hearing that much of the Indian government's evidence, including but not limited to the confession, was more properly viewed as the product of questionable police practice than as demonstrative of the probable guilt of Gill or Sandhu. A finding that the confession of Singh was such a product might, or might not, have influence on an extradition judge's assessment of the other evidence presented that was subjected to that same claim.[19] Under these circumstances, and in view of the fate of the other counts, the certification on Count 3 which is not directly implicated by the Singh confession, cannot be permitted to stand. A new hearing before an extradition magistrate should be held on all of the charges, assuming the Indian government wishes to reinitiate the complaints. *See Shapiro v. Ferrandina,* 478 F.2d 894, 907 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973) (citing *Collins v. Loisel,* 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed. 956 as authority for grant of writ of *habeas corpus* where evidence "sufficed as to one count in an extradition proceeding but not as to another").[20]

Such a result allows the Indian government to pursue afresh any or all of the extradition charges in the manner contemplated by the statutory scheme, *see In re Mackin,* 668 F.2d 122, 128 (2d Cir.1981)

(noting power of requesting party to refile the extradition request repeatedly) and permits the evidence supporting those counts to be heard in a new extradition proceeding at which the Ruikar ruling, previously denied petitioners by the Indian government when it was timely, may be offered should the Indian government continue to place reliance on the Singh confession. *See generally Hooker v. Klein,* 573 F.2d 1360, 1365–66 (9th Cir.1978) (practice since *Collins v. Loisel,* 262 U.S. 426, 43 S.Ct. 618, 67 L.Ed. 1062 (1923), of government's renewal of "extradition request after an earlier order of extradition had been set aside on *habeas corpus*," whether earlier request failed on merits or on procedural grounds); *In re Gonzalez,* 217 F.Supp. 717 (S.D.N.Y. 1963) (relying on *Loisel* for government's practice of refiling request after denial of extradition on legal grounds).

## IV. *Misconduct*

▮ Such a new hearing also will be certifiably free of any "infection" of the prior proceedings caused by the conduct of the Indian government's agent, the SAUSA, on the chance that any did unknowingly or undetectably arise. In view of the determination that a new probable cause hearing is required, however, it is not necessary to determine whether the serious and unfortunate misconduct engaged in by the SAUSA appointed to represent the Indian government at the extradition hearing would independently afford a basis for granting the writ to assure a new hearing.

**18.** Petitioners suggestion that the habeas court conduct a new extradition hearing itself *qua* extradition judge would not appear to be a sound remedial proposal consistent with the statutory scheme. *See Doherty,* 786 F.2d at 499, 500 n. 11 (2d Cir.1986) (reviewing court may not *"itself* issue the certificate that § 3184 makes a necessary precondition to extradition" since jurisdiction over the issuance of extradition certificates is denied the reviewing court by statute); *Shapiro,* 478 F.2d at 914 (*habeas* judge cannot alter certificate made by the magistrate).

**19.** Petitioners questioned the method by which photo identifications were conducted by Indian police, given indications of suggestibility. Petitioners also wished at the hearing to make a case concerning the basis for the findings of the Indian police handwriting expert. That expert's

work with respect to certain of Sandhu and Singh's specimens, it turns out, was critically examined by Judge Ruikar in a judgment subsequent to the hearing. Determinations whether to consider those judicial findings and whether to permit discovery and admit evidence as to such matters might be subject to different evaluation in a new hearing, in view of the Indian court's treatment of the Singh confession.

**20.** In its Reply Memorandum of December 29, 1989, Respondent concurs with the court's understanding that *Shapiro* stands "for the proposition that a *habeas* court can examine whether probable cause has been established for each of the crimes charged, and that detention is not legal simply because probable cause has been made out on one of numerous charges."

It is necessary to consider petitioners further request for an order absolutely precluding the refiling of charges against them on grounds of such conduct. That request, assuming the grant of it is within the power of a *habeas* court, is here denied, there being no support or authority for taking such a drastic, punitive measure against the requesting party. Even the less severe exclusionary rule has uncertain application to extradition proceedings, owing to the "doubtful deterrent effect on foreign police practices that will follow from a punitive exclusion of the evidence in question by an American court." *United States v. Morrow,* 537 F.2d 120, 139 (5th Cir.1976).

For that reason alone, although the SAU-SA's behavior fairly can be said to "shock the judicial conscience," *id.,* this would at most warrant affording petitioners a new hearing upon refiling of charges (assuming her conduct can fairly be imputed to the requesting party), as that remedy would ensure them that their treatment was free from any further prejudicial treatment that might have been occasioned by her disguised missives. *See United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

## V. *Anticipated Antipathetic Treatment of Gill and Sandhu*

■ Prior to the extradition hearing, petitioners proffered extensive documentary materials intended to demonstrate the likelihood that were they forced to return to India for trial on the serious charges laid against them, they, as Sikhs accused of politically-motivated terrorist killings, would be subjected to treatment "antipathetic to a federal court's sense of decency." *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). In support of this claim, petitioners offered, *inter alia,*

(1) an affidavit of a retired Indian High Court Justice, Ajit Singh Bains, who had conducted a commission (the "Bains Commission") on specific cases said to have been falsified by the police in an attempt to curb Sikh dissenters. The Bains Commission Report apparently identifies serious charges previously brought against Sandhu and Gill in India for the murder of a police superintendent in the City of Ludhiana. Those charges were determined by the Commission to be fabrications by the police (for which, in fact, no extradition has been sought).

(2) reports and documentation, sponsored by Amnesty International and other agencies, of extensive use of torture and the forced extraction of confessions by police officials against Sikhs;

(3) evidence of deaths of Sikhs in police custody, including particularly documentation of so-called "false encounters" staged by the police by which they reportedly summarily execute suspects in custody whom they believe to have committed acts of terrorism.

This substantial, chilling proffer from sources with at least surface credibility had convinced this court of the justification for further judicial inquiry lest "we ... blind ourselves to the foreseeable and probable results of the exercise of our jurisdiction." *Ahmad v. Wigen,* 726 F.Supp. at 410; *see also Barr v. United States,* 819 F.2d 25, 28 n. 2 (2d Cir.1987) ("[It is a] recognized principle that, regardless of the degree of American government involvement in the conduct of a foreign sovereign, the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct.").

*Barr*'s refrain has been echoed in the extradition context. On several occasions the Court of Appeals for this Circuit has allowed for the unfortunate, but realistic, possibility of there arising a case where a petitioner offered persuasive evidence that extradition would likely subject him to treatment shocking to the court's "sense of decency," thereby requiring reexamination of the black-letter rule of judicial non-inquiry into such conditions. *Gallina,* 278 F.2d at 79; *United States ex rel. Bloomfield v. Gengler,* 507 F.2d 925, 928 (2d Cir.1974); *Rosado v. Civiletti,* 621 F.2d 1179, 1195 (2d Cir.), *cert. denied,* 449 U.S.

856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980).[21] The cases in this circuit equally have taught that *Gallina* did not require or generally favor the holding of an evidentiary hearing, as the examination of affidavits and exhibits proffered in most instances would be more than adequate, *see Sindona v. Grant,* 619 F.2d 167, 175 (2d Cir.1980). However, in providing that lesson, the circuit continued to hold out "the caveat that some situations were imaginable in which a federal court might" be called upon to look again at the general principle of exclusive executive discretion. *Id.*

Petitioners' proffer, which purports to document the past laying of fabricated charges against Sikhs—including specifically Gill and Sandhu—and the prevalence of police torture and killing of Sikh suspects in custody, presents, at least facially, that "imaginable situation."[22] Whether evidence would in fact bear out the likelihood of petitioners being subjected to such treatment would require conducting a hearing. The strength of the proffer provides the substantial warrant for taking such a step toward re-examination of the rule of non-inquiry, as was contemplated by the *Gallina* Court.

That step is now foreclosed to a *habeas* court, the promise of *Gallina*'s dictum recently having been excised, without com-

ment. In *Ahmad v. Wigen,* 910 F.2d at 1066 (2d Cir.1990), the court just weeks ago disapproved the conducting of a hearing by the district court on a *habeas* claim as to conditions that a Palestinian petitioner might face upon extradition to Israel, in an opinion that cites *Gallina* solely for the proposition that "consideration of the procedures that will or may occur in the requesting country is not within the purview of a *habeas corpus* judge." *Id.,* at 1066.

*Ahmad* does not examine the proffer that was made to the *habeas* court nor acknowledge the concern, expressed in the noted past decisions of the circuit, that circumstances might come to pass where inquiry into such conditions became necessary. Instead the decision appears to block any such judicial inquiry by a *habeas* court based on its belief, "[s]o far as we know," that "the Secretary [of State] never has directed extradition in the face of proof that the extraditee would be subjected to procedures or punishment antipathetic to a federal court's sense of decency," finding it even "difficult to conceive of a situation in which a Secretary of State would do so." *Id.,* at 1067.

Petitioners point out that *Ahmad,* while it flatly holds that *habeas* courts have no cause to consider the conditions to which

**21.** This same view has been expressed and applied in other circuits. *See, e.g., Demjanjuk v. Petrovsky,* 776 F.2d 571, 583 (6th Cir.1985) ("There is absolutely no showing in this record that Israel will follow procedures which would shock this court's 'sense of decency.'"); *Arnbjornsdottir–Mendler v. United States,* 721 F.2d 679, 683 (9th Cir.1983) ("In light of Iceland's outstanding human rights' record and appellant's uncorroborated prediction of maltreatment, the district court had no obligation to hold an evidentiary hearing to consider the claim.").

**22.** The proffer submitted has subsequently found substantial support in a recent decision of the Board of Immigration Appeals of the U.S. Department of Justice, reversing a decision of an immigration judge denying political asylum to a 35–year–old Sikh man, who, like petitioners, was active in the All India Sikh Students Federation ("AISSF"). *Matter of Bhajan Singh,* No. A29–521–788 (May 30, 1990). The Board found it "abundantly clear that at least on four of the five occasions when he was arrested, the

applicant was placed under arrest based merely on his membership in the AISSF, or after attending a peaceful demonstration," and found credible his testimony "that he underwent torture during his detentions by local police officials due to his membership in the AISSF...." *Id.,* slip op. at 10. The Board found "enlightening" documents published by the Department of State, Amnesty International, and a report by a retired judge of the Punjab and Haryana High Court, which documents "reveal[ed] widespread abuses by national, state, and local police and security forces through arbitrary arrests, prolonged detentions, and torture, with little, if any, punishment for those involved in carrying out such acts." *Id.,* slip op. at 9.

> The Board's summation of the evidence it reviewed is haunting:
> [I]n light of the unequivocal evidence of record in this case, we would have found it surprising if the applicant had not in fact been subjected to arrest without charges, or tortured, so widespread does police lawlessness in the Punjab appear.

*Id.,* slip op. at 10.

an extraditee may be subjected in the requesting nation, does not rule that such considerations are beyond the lawful purview of the extradition judge or magistrate called upon to exercise his or her judgment as to extraditability at the certification hearing itself. *Id.*, at 1066.[23] That may be so, but *Ahmad* does, nevertheless, rather clearly foreclose, if not an extradition judge's than a federal *habeas* court's inquiry into such conditions, much as it condemns use of *habeas* as a means of rehearing the certification judge's decision as to such matters.

This lower court, although possessed of an imagination considerably less sanguine than that which found expression in *Ahmad*,[24] is bound by that decision and must therefore decline to inquire further—or direct further inquiry—into the conditions Gill and Sandhu may confront should they be extradited to India. The *Gallina* claim advanced here, although facially compelling under *Ahmad*, may not be heard by this court and does not provide any basis for the grant of a writ of *habeas corpus.*

*Conclusion*

The writ is granted on the grounds stated in favor of petitioners Gill and Sandhu.

In view of the need for a new probable cause determination, the court does not believe it appropriate or necessary to pass on the availability of the refugee defenses under the United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223 T.I.A.S. No. 6577 (Jan. 31, 1967), in the context of an extradition proceeding, nor on the specialty doctrine's application to the prospect of petitioners' prosecution, should they be extradited under the TADA.

Petitioners shall be discharged by the Respondent unless within thirty (30) days an appeal is taken from this order or extradition complaints against them are filed or renewed in the district of their custody pursuant to 18 U.S.C. § 3184.

It is so ordered.

**23.** A ruling that such considerations are beyond the competence of the extradition judge would be unenforceable since a determination by an extradition magistrate to withhold certification under 18 U.S.C. § 3184, on whatever ground, is unappealable. *See Ahmad,* 910 F.2d at 1066; *In re Mackin,* 668 F.2d at 127; *Jhirad,* 536 F.2d at 482. The requesting party's remedy is to refile charges, *Ahmad,* 910 F.2d at 1065, a procedural element which offers by way of compensation to the requesting party the capacity to do so over and over without prior determinations working any estoppel on subsequent hearing officers. *Id. see Doherty,* 786 F.2d at 503; *In re Mackin,* 668 F.2d at 128.

**24.** This circuit, when it previously considered the distinct matter of the political offense exception to extradition, recognized that judgments by the executive branch on extradition matters may, out of understandable concern for the maintenance of friendly international relations, be constrained. As Judge Friendly stated in *In re Mackin,* 668 F.2d at 133:

The Government notes that a judicial decision on the political offense exception may cause difficulties in this country's foreign relations; such difficulties would exist also, indeed might be heightened, if decision were placed

solely in the executive branch, unless the political offense exception were to be eviscerated in practice in the case of extradition treaties with nations with which we are allied or whose favor we especially desire.

*See also* J. Kester, "Some Myths of United States Extradition Law," 76 Geo.L.J. 1441, 1481 (1988) (considering State Department's incentives in "weigh[ing] the rights of individuals against the government's own international law enforcement and foreign policy agenda."); Note, Executive Discretion in Extradition, 62 Colum.L.Rev. 1313, 1325 (1962) (noting statement of Legal Advisor to Secretary of State in 1934, when Germany sought extradition of a Jew, that "the United States would not be justified in declining to surrender the fugitive ... merely because of an allegation of probable failure to receive a fair trial."). It is not apparent from the *Ahmad* opinion why it is so "difficult to conceive" that the same practical concerns and constraints noted in *Mackin* might operate in the context of an extradition determination involving a subject facing procedures or punishment antipathetic to a court's sense of decency. Nor is it apparent why respondent in this proceeding has taken care to remind the court that this country has friendly relations with India. *See* Resp.Mem. of October 11, 1989, p. 52.